MURDOCK, Judge.
In December 1996, Faron Walley injured his back in the course of his employment as a shipfitter for Bender Shipbuilding & Repair Co., Inc. (“Bender”). Walley filed a complaint against Bender, alleging, among other things, that Bender had made fraudulent representations to him following his injury. Walley alleged that Bender had established a policy of providing light-duty work to certain injured employees, namely, employees entitled to medical or compensation benefits from Bender pursuant to the Longshoremen and Harbor Workers’ Compensation Act, 33 U.S.C. § 901 et seq. (1986) (“LHWCA”). More specifically, under Bender’s policy, employees suffering from a temporary partial disability who were incapable of returning to their regular work with Bender but who were capable for performing light-duty work were offered such light-duty work if it was available. Walley alleged, however, that, in his case, Bender falsely represented to him that no light-duty work was available and that, as a result of this alleged misrepresentation, Walley suffered monetary losses and mental anguish and was therefore entitled to compensatory and punitive damages.
Walley’s claim was submitted to the jury as an intentional-fraud claim. The jury returned a verdict in favor of Walley and against Bender and awarded $40,000 in compensatory damages. The Mobile Circuit Court entered a judgment based on the jury’s verdict.
Bender appeals, arguing that the trial court erred by denying its pretrial motion for a summary judgment and by denying motions it filed during and after trial for a judgment as a matter of law. Bender contends that Walley’s claim for intentional fraud was “barred, precluded, and preempted” by 33 U.S.C. § 905(a), the exclusivity provision of the LHWCA, and that, although some courts have recognized an intentional-tort exception to the exclusivity provision if the employer specifically intended to injure the employee, Walley did not introduce sufficient evidence tending to show that Bender specifically intended to injure him.
I. Facts and Procedural History
In 1990, Walley injured his upper back while he was working at Bender’s shipyard as a shipfitter for a company known as T.J. Adams, a subcontractor of Bender. For the next two years, Walley was unable to work because of his injury. During this time, T.J. Adams, through its workers’ compensation insurance carrier, Liberty Mutual, paid for Walley’s medical treatment and also paid Walley temporary disability compensation pursuant to the LHWCA. Dr. James West, Walley’s treating physician, eventually assigned him a 5% permanent impairment rating and released him for full-duty work with no restrictions in 1992. After his release, Walley worked for the next three years as a shipfitter, welder, and fabricator for two companies other than T.J. Adams and Bender. Walley was able to perform the same type of work he had performed before his 1990 back injury. During the three-year period between 1992 and 1995, Walley had no further injury to his back.
*571 In 1995, Walley was again employed by a subcontractor to work at Bender’s shipyard. After approximately three months, however, Bender hired Walley to work directly for Bender. At that time, Walley was examined by Bender’s physician and was determined to be physically and mentally fit for work as a shipfitter.
In November 1996, Walley complained to his foreman at Bender that he was experiencing work-related soreness in his upper back and shoulder. Walley was examined by Dr. West and was prescribed some pain medication; he immediately returned to work. He worked for the next few weeks without incident.
On December 9, 1996, Walley injured his back while lifting a mooring hook on a ship at Bender’s shipyard. Walley informed his foreman of the injury and finished his shift despite the injury. The next morning, Walley’s back pain had worsened and he contacted his foreman, who told him to contact Vicki Wagner, an employee in Bender’s safety department. When Wagner asked Walley whether his injury was related to his 1990 upper-back injury, Walley stated that it might be, but that his entire back was hurting. Conflicting evidence was introduced at trial as to whether Walley’s December 1996 injury was a recurrence of his 1990 injury, as opposed to an aggravation of his 1990 injury or a new injury. More importantly for purposes of Walley’s intentional-fraud claim, there was conflicting evidence as to whether Bender understood and believed Walley’s December 1996 injury to be a recurrence of his 1990 injury, rather than an aggravation of that injury or a new injury.[1]
Wagner made Walley an appointment with Dr. West, who examined Walley on December 10, 1996, and informed him that he should not return to work at that time. Dr. West examined Walley on four other occasions during the next month and, after each examination, he told Walley that he should not return to work at that time. Although a December 18, 1996, entry by Dr. West on Walley’s medical chart contains a statement that “[t]he patient states that this is related to his old injury and not [a] new injury,” Dr. West’s subsequent January 22, 1997, notes reflect his opinion that “this is an exacerbation of [Walley’s] previous injury.”
On January 22, 1997, Dr. West again examined Walley and released him to return to work with a light-duty restriction. Walley returned to Bender’s shipyard and provided Wagner with his light-duty work release. However, Walley testified that Wagner and Jerry Davis, a safety and risk manager for Bender, discussed the release and told him that Bender had no light-duty work available.[2]
*572 We note that Bender was self-insured under the LHWCA and that its light-duty work policy for partially disabled employees was in addition to its obligations with respect to compensation and medical benefits under the LHWCA. Under the light-duty work policy, Bender paid an injured employee the full amount of his or her normal weekly wage when the employee engaged in light-duty work. Employees receiving only temporary disability benefits under the LHWCA received payments equal to only a portion of their normal weekly wage. See 33 U.S.C. § 908. Davis testified that one of the reasons Bender established its light-duty work policy was that it knew that employees could become fearful, anxious, and depressed when they could not return to work after an on-the-job injury and that the policy benefited both Bender and its injured employees.
Although T.J. Adams, through Liberty Mutual, initially paid for Walley’s medical expenses resulting from his December 1996 injury, T.J. Adams refused to pay Walley’s temporary disability benefits and eventually stopped paying his medical expenses. In March 1997, Walley retained an attorney and filed a complaint against Bender with the United States Department of Labor. Pursuant to its rights under the LHWCA, Bender initially contested Walley’s claim. However, after a June 1997 meeting between the Department of Labor, Bender, and Walley, Bender accepted the Department of Labor’s finding that Bender was responsible for Walley’s medical expenses and compensation benefits under the LHWCA. Bender began paying Walley’s medical expenses and, within a few weeks, also began paying Walley temporary disability benefits. Bender thereupon also offered Walley light-duty work in accordance with its light-duty work policy.
Walley had no income between the date of his December 1996 back injury and June 1997, when Bender accepted responsibility for paying LHWCA benefits to Walley. Dr. West released Walley to return to full-duty work effective September 1, 1997.
Although Bender paid Walley’s medical expenses and also his LHWCA compensation benefits accruing after the June 1997 meeting with the Department of Labor,[3] it was not until July 1998 that Bender paid Walley the temporary disability benefits due for the period from his December 1996 injury until the June 1997 meeting.[4] Bender subsequently paid penalties assessed by the Department of Labor against Bender for its failure to ■ make timely compensation payments in accordance with the LHWCA. See 33 U.S.C. § 914(e).
Walley was unable to pay his living expenses for several months after Dr. West released him for light-duty work in January 1997. As noted, during the period, Bender did not pay Walley compensation benefits under the LHWCA and did not provide him with light-duty work. As a result, Walley borrowed money from fami *573 ly and friends to pay his living expenses. He also received assistance from community resources, and he eventually applied for and received food stamps. Walley averted creditors’ efforts to repossess his truck and to foreclose on his home by borrowing money from his family, including a $20,000 loan from his parents. Because he had no source of income, Walley was unable to pay a court-ordered monthly child-support obligation for the benefit of his son. Wal-ley stated that his former wife attempted to have him held in contempt for his failure to pay child support and that she refused to let him exercise his visitation rights with their son until he had paid all of his child-support obligation. As noted above, in July 1998, Bender paid Walley all of the remaining temporary disability compensation to which he was entitled. After receiving that payment, Walley paid his past-due child-support obligation; he had been unable to visit with his son for approximately 18 months. There was evidence introduced at trial indicating that Walley was so affected by his circumstances that, in May 1997, a neighbor had Walley hospitalized because he had not been eating and she was concerned about his being depressed.
In October 1997, Walley sued Bender in the Mobile Circuit Court alleging, in pertinent part, that Walley was entitled to an offer of light-duty work after he was released for such work in January 1997, but that Bender falsely represented to Walley that no light-duty work was available.[5] Walley alleged that as a result of Bender’s alleged fraud, he suffered monetary losses and mental anguish; he requested both compensatory damages and punitive damages.
As previously indicated, by July 1998, Bender had paid Walley all of the temporary disability compensation to which Wal-ley was entitled pursuant to the LHWCA. Thereafter, Bender filed a motion for a summary judgment arguing, among other things, that Walley’s fraud claim was barred by the exclusivity provision of the LHWCA, 33 U.S.C. § 905(a), and also that, although some courts have recognized an intentional-tort exception to the LHWCA’s exclusivity provision if the employer has specifically intended to injure the employee, Walley had failed to allege and offer evidence that Bender specifically intended to injure him. The trial court denied Bender’s motion.
Walley’s case proceeded to trial. At the close of Walley’s evidence and again at the close of all of the evidence, Bender filed motions for a judgment as a matter of law, renewing its argument that Walley’s fraud claim was barred by the exclusivity provision of the LHWCA and that Walley did not qualify for the intentional-tort exception to the LHWCA’s exclusivity provision. The trial court denied both of those motions and submitted Walley’s claim to the jury only as a claim alleging intentional fraud. As noted above, the jury returned a verdict in favor of Walley and against Bender for $40,000 in compensatory damages, and the court entered a judgment on that verdict. Bender filed a postjudgment motion for a judgment as a matter of law pursuant to Rule 50, Aa. R. Civ. P.; the trial court denied that motion.
II. Issues
On appeal, Bender renews its argument that the LHWCA is Walley’s exclusive remedy. Bender notes in its initial brief to this court that some courts have held that the LHWCA’s exclusivity provi *574 sion does not bar an employee’s separate tort claim against his employer if the employee can prove that the employer specifically intended to injure the employee, see, e.g., Houston v. Bechtel Assocs. Professional Corp., 522 F.Supp. 1094 (D.C.Cir.1981) (holding that nothing short of specific intent to injure falls outside the scope of the LHWCA), Austin v. Johns-Manville Sales Corp., 508 F.Supp. 313 (D.C.Me.1981), and contends that Walley did not introduce substantial evidence of a specific intent by Bender to injure Walley. Walley responds by arguing that any so-called “specific intent” exclusion to the exclusivity provision of the LHWCA is inapposite because, he argues, his claim does not fall within the province of the LHWCA to begin with.
As a preliminary matter, we note that the “specific intént to injure” that, under the above-cited cases, would be necessary to remove an employer’s action from the protection of the exclusivity provision of the 33 U.S.C. § 905(a) is not the same as the “general intent” that must be shown as a matter of state law in order to make out a claim for intentional fraud. Under Alabama law, in order to prove intentional fraud, a plaintiff must show (1) an intentional misrepresentation (2) of a material fact, (3) upon which the plaintiff reasonably relies, see Newman v. First National Bank of Mobile, 497 So.2d 106 (Ala.1986), and (4) that, as a proximate result of the misrepresentation, the plaintiff suffers actual damage. See, e.g., Reeves Cedarhurst Dev. Corp. v. First American Federal Sav. & Loan, 607 So.2d.180 (Ala.1992); Mobile Dodge, Inc. v. Waters, 404 So.2d 26, 27 (Ala.1981). See also § 6-5-103, Ala.Code 1975. In order to show the requisite intent to satisfy the first of these elements, a plaintiff must simply show a willful misrepresentation with “knowledge of [the] falsehood or reckless disregard for the truth,” Dodd v. Nelda Stephenson Chevrolet, Inc., 626 So.2d 1288, 1292 (Ala.1993),[6] not a specific intent to injure.
We also note that, in addition to the argument Bender reiterates on appeal regarding the exclusivity of Walley’s remedy under the LHWCA, in its summary-judgment motion and its motions for a judgment as a matter of law, Bender also asserted that Walley failed to present substantial evidence as to the various elements of intentional fraud under state law. On appeal-, however, Bender does, not .reassert this position. We therefore do not have before us the issue of whether the evidence was sufficient to support a finding that, at the time it declined to offer light-duty work to Walley, Bender actually knew that Walley’s December 1996 injury was of such a nature that Bender was responsible for the payment of LHWCA benefits with respect thereto (and, therefore, actually knew that Walley fell within Bender’s light-duty work policy), that Wal-ley’s reliance on the alleged misrepresentation was reasonable or that the damage suffered by Walley was a proximate result of his reliance on the alleged misrepresentation. Both this court and our Supreme Court have held that we will not address *575 arguments not raised on appeal. See Deutcsh v. Birmingham Post Co., 603 So.2d 910, 911 (Ala.1992), cert. denied, 506 U.S. 1052, 113 S.Ct. 976, 122 L.Ed.2d 130 (1993); Newton v. Town of Columbia, 695 So.2d 1213, 1216 (Ala.Civ.App.1997).[7]
Turning to the merits of Bender’s argument regarding the exclusivity of the benefits prescribed under the LHWCA, we note that the LHWCA states that “[e]very employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 of this title.” 33 U.S.C. § 904(a). Section 905(a) states, in pertinent part:
“The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, ... and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury.”
33 U.S.C. § 905(a). The LHWCA defines an “injury,” in pertinent part, as an “accidental injury ... arising out of and in the course of employment.” 33 U.S.C. § 902(2).
Bender argues, among other things, that § 905(a) barred Walley’s intentional-fraud claim, because, it says, the fraud claim relates to the alleged mishandling or denial of benefits due under the LHWCA and arose out of Walley’s work-related injury. In support of its argument, Bender relies heavily upon Atkinson v. Gates, McDonald & Co., 838 F.2d 808 (5th Cir.1988), and similar cases that hold that an employee’s state-law. claims for bad-faith refusal to pay LHWCA compensation and for wrongful termination of LHWCA compensation are barred by § 905(a). See Barnard v. Zapata Haynie Corp., 975 F.2d 919 (1st Cir.1992); Hall v. C & P Tel. Co., 809 F.2d 924 (D.C.Cir.1987); Sample v. Johnson, 771 F.2d 1335 (9th Cir.1985); Kinder v. Crawford and Co., 962 F.Supp. 10, 11 (D.Puerto Rico 1997).
All of the cases cited by Bender are distinguishable from the' present case. Each concerns the withholding of benefits due under the LHWCA As the court stated in Atkinson:
“Atkinson ‘is asserting what are in essence state law claims for bad faith intentional infliction of emotional distress’ in terminating and refusing to pay compensation benefits and medical expenses which Atkinson was entitled to under the LHWCA. [Atkinson v. Gates, McDonald & Co., 665 F.Supp. 516, 519-20 (S.D.Miss.1987).] The district court held, and we agree, ‘that the exclusivity provisions of both the Nonappropriated Fund Instrumentalities Act and the LHWCA, ... coupled with the penalty provision ... of the LHWCA, operate to bar Atkinson’s claims.’ Id. at 519.... In essence, then, Atkinson’s state law claims are preempted by the Unappropriated Fund Instrumentalities Act and the LHWCA, which provide the exclusive remedy for the nonpayment of compensation benefits due thereunder.”
Atkinson, 838 F.2d at 809-10 (footnotes omitted; emphasis added).
Unlike Atkinson and the other cases cited by Bender, the present case does not involve benefits an employer is required to *576 pay pursuant to the LHWCA. The LHWCA- did not require Bender to provide light-duty work to Walley as part of his “compensation,” and it did not provide Walley with any redress for Bender’s alleged fraud in denying him light-duty work. See generally 33 U.S.C. § 901 et seq. The mere fact that Walley could not claim Bender’s light-duty-work benefit unless Bender was also responsible for paying his LHWCA compensation did not convert the light-duty-work benefit into “compensation” due under the LHWCA. Thus, Bender’s argument that Walley’s claim is simply a claim for the mishandling or denial of benefits due under the LHWCA is without merit. Cf. Stoecker v. Brush Wellman, Inc., 194 Ariz. 448, 452, 984 P.2d 534, 538 (1999) (holding that an employee’s contract claim for benefits promised by an employer to supplement workers’ compensation benefits was not barred by the workers’ compensation statute’s exclusivity provision and noting that the employee’s claim was not a disguised attempt to collect, in tort for his on-the-job injury, but was a “contract count, seeking only money owed by reason of [the employer’s] contractual obligation to supplement ... compensation benefits”); Shattuck-Owen v. Snowbird Corp., 16 P.3d 555, 561 (Utah 2000) (“interpreting the exclusivity provision to void all contracts for benefits of the type also provided by workers’ compensation would allow unscrupulous employers to take advantage of unsophisticated workers by promising benefits that the employers have no intention of delivering”; quoting 9 A. Larson & L. Larson, Larson’s Workers’ Compensation Law § 157.05[3], 157-46 (2000), . for the proposition that “ ‘contractual excess is not workers’ compensation. It performs the same functions, and is payable under the same general conditions, but legally it is nothing more than the fruit of a private agreement to pay a sum of money on specified conditions’ ”).[8]
Bender cites Atkinson for the proposition that “a ‘state law cause of action for conduct which the LHWCA addresses is in effect preempted by the LHWCA even though the relevant LHWCA section contains no expressly preemptive language.’ ” This may be a correct statement of law, but it does not dispose of the issue presented in this case, because the conduct at issue — Bender’s misrepresentation concerning an undertaking outside the LHWCA — is not “conduct which the LHWCA addresses.” The emphasized language in the following passages from Atkinson serve to highlight the difference that distinguishes Atkinson from the present case: (1) “[T]he LHWCA *577 is plainly preemptive of any state law claim for intentional or bad faith wrongful refusal to pay benefits due under the Act.” 838 F.2d at 812 (emphasis added). (2) “[A] majority of courts have held that workers’ compensation statutes, particularly where they address the subject of delayed or withheld compensation benefits, provide the exclusive remedy.” Id. at 813 (emphasis added). (3) “ ‘Since the Act itself provides not only for payment of benefits, but also for redress in the event of nonpayment of benefits, and further does not distinguish between good faith and bad faith nonpayment of benefits, the apparent intent of the Act is that the penalty provisions provide the exclusive remedy for late payment or nonpayment of benefits.’ ” 838 F.2d at 812 (quoting Atkinson, 665 F.Supp. at 521) (emphasis added). (4) An employer has the “unfettered right to controvert a claim for compensation.” 838 F.2d at 812 (emphasis added).
Unlike the claims in Atkinson and the other cases relied upon by Bender, the state-law claim submitted to the jury in the present ease was not a claim for an alleged improper handling or denial of benefits due under the LHWCA. As noted, Bender eventually paid all compensation and medical benefits due Walley under the Act, as well as all related penalties due under the Act, and Walley dismissed his claims pertaining to Bender’s initial denial of those benefits.
Walley’s claim that was submitted to the jury was based upon an alleged intentional misrepresentation that there was no light-duty work available during the period of Walley’s temporary disability. Any obligation to provide Walley with such light-duty work in the first place, and therefore any duty to avoid misrepresenting the availability of such work, arose outside of the LHWCA. It arose because Bender undertook to provide such work and the full compensation associated therewith as an additional benefit to its employees. Providing such work was not a benefit required by the LHWCA.
Unlike the plaintiffs claims in Atkinson, Walley’s claims in the present case do not seek redress for the employer’s “refusal to pay benefits due under the Act.” We therefore hold that the trial court properly submitted Walley’s state-law fraud claim to the jury and affirm the trial court’s judgment based on the resulting jury verdict.
AFFIRMED.
YATES, P.J., and CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.

. A work-related accident that aggravates or worsens a prior injury, or that results in a new injury, is compensable under the LHWCA by the employer for whom the employee was working at the time of the accident. See Jacksonville Shipyards, Inc. v. Director, Office of Workers’ Compensation Programs, United States Dep't of Labor, 851 F.2d 1314, 1316-17 (11th Cir.1988); Foundation Constructors, Inc. v. Director, Office of Workers Compensation Programs, 950 F.2d 621 (9th Cir.1991). Wagner admitted that she knew that Walley was entitled to LHWCA benefits from Bender if the December 1996 injury had aggravated Wal-ley’s 1990 injury, or if the December 1996 injury was a new injury. As previously noted, under the policy that had been developed by Bender, if an employee suffered from a temporary partial disability that entitled the employee to LHWCA benefits from Bender, Bender assumed the additional obligation of offering light-duty work to that employee, if such work was available.

. Davis testified that Walley was informed that he was not “eligible” for light-duty work, not that it had no light-duty work. However, Walley testified that he was never informed that he was not “eligible” for light-duty work, *572 and Dr. West's notes from a telephone conversation he had with Wagner on January 24, 1997, stated, in pertinent part, "[p]er [Wagner], Bender has no light duty work available.” It was undisputed that Bender had light-duty work available when it allegedly informed Walley that it did not.

. Although Walley accepted Bender's June 1997 offer of light-duty work, for part of the time between June 1997 and Walley’s return to full-duty work in September 1997, he was unable to engage in such work and therefore accepted temporary disability benefits for part of that time.

. With the payments made by Bender in July 1998, Bender completed the payment of all compensation and medical benefits due Wal-ley under the LHWCA.

. Walley also alleged that Bender had wrongfully refused to timely pay him temporary disability benefits to which he was entitled during 1997; however, these claims were not submitted to the jury.

, Although reckless disregard, for the truth may normally be sufficient to show “intentional” fraud as a matter of state law, in the present case the trial court did not'instruct the jury as to "reckless misrepresentation,” but limited its instructions to the concept of a "willful misrepresentation.” Specifically, the court instructed the jury that Bender must have "willfully misrepresented a material fact to the plaintiff -with the intent to induce plaintiff to act thereon,” and that the defendant must have "deceived the plaintiff by a willful representation of a material fact as true which it knew to be untrue to induce the plaintiff to act” and that "the defendant's knowledge of the falsehood is an essential element.” Walley acquiesced in the limitation of the jury charge in this manner.

. We also note that an issue exists as to whether Walley's injuries sound in contract or in tort, i.e., whether Walley's injuries resulted from a breach by Bender of a contractually assumed obligation to provide light-duty work to certain employees or from an alleged tor-tious misrepresentation relating to that obligation. During the trial, the parties discussed whether a breach-of-contract claim was barred by the exclusivity provisions of the LHWCA; however, Walley never asserted a claim for breach of contract.

. See also Lowman v. Piedmont Executive Shirt Mfg. Co., 547 So.2d 90, 95 (Ala.1989) (where employee alleged that while she was in the hospital recovering from an on-the-job injury, her employer attempted to have her file documents stating that her injury actually occurred at home, the Alabama Supreme Court held that the employee's fraud claim fell outside the exclusivity provision of Alabama's Workers' Compensation Statute, rejecting a "boot-strapping” approach that would depend on a "but-for” relationship between the on-the-job injury and the employer’s subsequent actions); Griggs v. All-Steel Buildings, Inc., 209 Ga.App. 253, 255, 433 S.E.2d 89, 90 (1993) (an employee, who was mentally impaired by a work-related accident, alleged that the employer's workers’ compensation insurance carrier had fraudulently procured a settlement of his workers' compensation claim. The Georgia Court of Appeals rejected the application of the exclusivity provision of Georgia’s workers’ compensation statute and stated that, "[fjraud ... is not an 'accident' and the damages resulting therefrom do not arise 'out of or in the course of the employment,' but rather, result from the intentional misconduct of the defendants subsequent to the physical injuries which gave rise to the original workers’ compensation claim.”).